C. ITOH & CO. AMERICA,
INC., Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 77–2–00271.

United States Court of International
Trade.

April 7, 1981.

Barnes, Richardson & Colburn, New York City (James S. O'Kelly, New York City, at the trial; Jack D. Mlawski, New York City, with him on the briefs), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City (John J. Mahon, New York City, at the trial and on the briefs), for defendant.

RAO, Judge:

The issue presented in this case is the proper classification of merchandise invoiced as "XL 223 Man-Made Plastic Leather Cloth" manufactured in Japan by Toray Industries, Inc., exported from Japan on October 20, 1975 and entered on November 7, 1975 at the port of Wilmington, Dela-

ware. The merchandise is also known as "Ecsaine" and is widely known in the trade as "Ultrasuede."

The merchandise was classified under the following provision of the Tariff Schedules of the United States:

Webs, wadding, batting and non-woven fabrics, including felts and bonded fabrics, and articles not specially provided for of anyone or combination of these products, all of the foregoing of textile materials, whether or not coated or filled:

\* \* \* \* \* \* \*

355.25    Of man-made fibers ........  12¢ per lb.
+ 15% ad val.

and is claimed classifiable under:

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \*

774.60    Other ....................  8.5% ad val.

or, alternatively, under:

Textile fabrics, including laminated fabrics, not specially provided for:

\* \* \* \* \* \* \*

359.60    Other ....................  8.5% ad val.

It is plaintiff's claim that the merchandise is of plastics, in that the component material in chief value of the merchandise is plastics, and that, by virtue of General Interpretative Rule 10(f), the cost of the plastics component must be compared to that of the fiber component to determine the material in chief value of the imported merchandise.[1]

Plaintiff called one witness at the trial and introduced five exhibits. The witness, Mr. Masao Ijiri, is the production manager for Ecsaine for Toray Industries in Japan and has held this position for approximately five years. He described the method by which the merchandise is produced as involving five steps. A 0.1 denier polyester

fiber yarn is produced by another branch of Toray Industries and it is coated with a polystyrene before delivery to the Ecsaine factory. By needle-punching, the yarns are formed into an entangled fiber sheet which is then dipped into a special plastic resin solution.[2] The plastic resin penetrates the fiber sheet but does not alter the composition of the polyester fibers. The polystyrene is then extracted from the fiber sheet by use of a special solvent, leaving the polyester fiber and the plastic resin. Next the fiber sheet is dipped into a urethane solution obtained by adding unspecified chemicals and solvent to a polyurethane solution, with the result that three materials are present in the fiber sheet: polyurethane, polyester and plastic resin. The fiber sheet is then split horizontally, buffed to raise a nap which resembles suede, and dyed. It is produced and exported in pieces ranging in measurement from 45 inches wide by 16.8, 21.8, 32.8 to 38.2 yards in length and is also identified on the invoices by weight.

A visual and tactile examination of the sample of the merchandise, plaintiff's exhibit No. 1, shows it to be flexible, soft and resistant to creasing, wrinkling and abrasion.

The polyester component of the Ecsaine was not within the knowledge of the witness, as it was furnished by another division of Toray Industries, Inc. That it is a man-made fiber is beyond dispute, since the raw material for polyester is oil.[3] The materials with which the polyester fibers are coated are conceded to be plastics, although some unnamed chemicals are also involved.

However, it is not clear to this court that the cost of the plastics components submitted by plaintiff (plaintiff's exhibit No. 5) is substantiated by the testimony at trial. Mr. Ijiri testified that the polyurethane to which the fiber sheet was joined constituted

1. 10. *General Interpretative Rules.* For the purposes of these schedules—
\*    \*    \*    \*    \*
(f) an article is in chief value of a material if such material exceeds in value each other single component of the article; \* \* \*

2. The identity of the plastic resin was not disclosed at the trial.

3. *See* Moncrieff, *Man-Made Fibres*, Wiley Interscience Division, John Wiley & Sons, Inc., New York, 1970, p. 402.

approximately 12 to 14 percent of the polyurethane mixture in which the fiber sheet is dipped (R. 63). The other 86 or 88 percent consists of an unidentified solvent and other unidentified chemicals (R. 64). It is unclear whether the cost figures submitted by plaintiff reflect this percentage in the allocations for raw materials and chemicals made at the polyurethane/sheet joinder stage, and the witness testified that he could not recall the cost of polyurethane in 1975, the year in which the merchandise was imported (R. 64), or the cost of the solvent (R. 65). No other evidence was adduced with respect to the correctness of the figures that were submitted in plaintiff's exhibit No. 5.

The defendant raised the issue of whether the cost of the plastic resin should be allocated to the cost of the polyester fiber component rather than to the plastics material, since it is part of the cost involved in the preparation of the polyester fiber sheet for joinder with the polyurethane mixture. It also claimed that the cost of the plastics bonding or coating components should be disregarded in determining the component fiber in chief value of the merchandise, pursuant to headnote 4(b) to schedule 3.[4]

## I.

The issue basic to a determination of the proper classification of the imported merchandise is whether it is a nonwoven fabric of man-made fibers or should be considered articles of plastics for tariff schedule purposes. If it is a nonwoven fabric of man-made fibers, it is classifiable as a fabric as Congress has evidenced an intent that all fabrics have been provided for in schedule 3, except for those specifically provided for elsewhere in the tariff schedules. The *Tariff Classification Study, Explanatory and Background Materials*, 1960, at page 4 of the volume covering schedule 3, states:

Schedule 3 is an orderly, systematic presentation of most of the provisions which would cover importations of textile products. The proposed provisions are full and complete and take into account technological progress in the textile industry, which, perhaps, has been most strikingly exhibited in the man-made fiber laboratories and production plants.

\* \* \* \* \* \*

[P]arts 3 and 4 cover all textile fabrics in the piece and, in addition, a few special classes of articles; \* \* \*

■ The evidence adduced at trial was limited to information concerning the costs of the components which are used in the manufacture of the Ecsaine. The court can consult scientific authorities and other reliable sources of information as an aid in determining the denomination of imported merchandise in the trade. *Transatlantic Company v. United States*, 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397 (1973); *Nylos Trading Company v. United States*, 37 CCPA 71, C.A.D. 422 (1949). The manner in which merchandise is regarded in the trade is pertinent in deciding its proper classification.

In an article in *Women's Wear Daily* (a daily periodical which the court takes judicial notice to be a recognized authority on the fashion industry in this country), July 20, 1976, "Suedelike flood: The fake fakes," Caroline Bernstein consistently refers to "Ultrasuede" as a fabric that is being imitated by other "suedelike synthetic fabrics" and describes it as "a nonwoven fabric of 60 percent polyester and 40 percent non-fibrous polyurethane." In this article, "Ultrasuede" is listed with other synthetic suedes, which vary from 100 percent polyester to polyester and rayon blends, all of which are considered fabrics.

In another article, "Ultra Demand for Versatile Ultrasuede," Dee Wedemeyer, *New York Times*, February 26, 1977, "Ultrasuede" is repeatedly referred to as a fabric, and is described as "60 percent polyester and 40 percent polyurethane \* \* \*

---

**4.** Headnote 4(b) to schedule 3 provides that "in determining the component fibers of chief value in coated or filled, or laminated, fabrics and articles wholly or in part thereof, the coating or filling, or the nontextile laminating substances, shall be disregarded in the absence of context to the contrary."

pressed or packed, somewhat like felt is, not woven," and is referred to as "[t]he Rolls-Royce of the fabric industry" by a vice president of the American distributor and owner of the registered trademark for the fabric. A New York sales agent for several suede and leather tanners is quoted in this article as referring to "Ultrasuede" as being capable of machine washing and tumble drying, or being dry cleanable with standard methods which are less expensive than suede dry cleaning. Bill Blass, the nationally known designer, is quoted as having "a standing order on hand for the fabric all the time."

Additionally, in *The Trade*, Dec.-Jan. 1976, page 18, in an article titled "The Psuedo-suedes," "Ultrasuede" is listed as a "fabric, 100% polyurethane coated, non-woven, 45", weight-mid," among other fabrics which simulate suede; and in *Trade Names Dictionary*, edited by Ellen T. Crowley, Gale Research Company, Detroit, Michigan, 1979, p. 837, Volume 2, "Ultrasuede" is listed as a fabric.

■ Thus, it can be concluded that "Ultrasuede" or "Ecsaine" is considered to be a fabric in the fashion industry, in which it is used to manufacture both women's and men's high fashion garments by leading designers in this country. Indeed, plaintiff refers to the merchandise as a fabric on page 6 of its brief in stating that "[i]n the seventh and eighth stages the fabric is split, buffed and dyed."

■ Having concluded that the merchandise is a fabric for tariff schedule purposes, it is necessary to determine whether it is "of textile materials" and "of man-made fibers." Textile materials are defined in schedule 3, headnote 2(a)(i) as being the fibers (cotton, other vegetable fibers, wool and hair, silk, and man-made fibers) provided for in part 1 of schedule 3; fibers are defined in part 1, subpart E, headnote 3(f) as including filaments and strips in noncontinuous form, and any other fibrous structure suitable for the manufacture of textiles. There can be no doubt that the polyester fibers that are needle-punched into the felt sheet that is joined with the poly-

urethane solution are textile fibers, and therefore textile materials.

The polyurethane component of the imported merchandise is also a textile material. In the *Encyclopedia of Textiles* (Second Edition), Prentice Hall, Inc. (1972), page 391, the word "polyurethane" is listed as synonymous with the word "urethane" which is defined as:

> *Urethane.* A chemical family of cross-linked polymers subject to reactions which cause foaming. The foams are used for bonding and laminating fabrics. The term has gradually replaced the term *polyurethane.*

Moncrieff, *supra* at note 3, identifies a fiber (Perlon U) made entirely of polyurethane and states that modern spandex fibers are polyurethanes. See page 442.

■ Plaintiff relies on *Canadian Vinyl Industries, Inc. v. United States*, 76 Cust.Ct. 1, C.D. 4626, 408 F.Supp. 1377 (1976), aff'd, 64 CCPA 97, C.A.D. 1189, 555 F.2d 806 (1977) for the proposition that the correct classification of the merchandise hinges on whether it is "of plastics" which for tariff schedule purposes involves a determination of component material in chief value for the merchandise. *Canadian Vinyl* involved the issue of whether flexible sheets of nylon fabric laminated with a polyurethane skin were properly classifiable under item 771.40 as flexible sheets made in imitation of patent leather. The court considered that the merchandise was almost wholly of plastics (not the issue presently before us) and that it was the plastics material that imparted the essential character to the merchandise, and not the nylon fabric backing. In determining whether an article is "of" rather than "almost wholly of" a material, it is only the component in chief value which is considered, and not the component which imparts the essential characteristic to the merchandise. In *Canadian Vinyl*, the court considered whether the merchandise was classifiable under a *specific* provision in schedule 7, and properly concluded that since there was a specific provision in schedule 7 for the merchandise, it was precluded

from classification under schedule 3, following the dictates of headnote 1(vii) to part 4C of schedule 3 which provides that the subpart does not cover other articles specially provided for in schedule 7 or elsewhere. The "Ultrasuede" or "Ecsaine" not specially provided for in schedule 7 as item number 774.60, under which plaintiff claims is not a specific provision, but merely a basket provision for articles *not* specially provided for, of rubber or plastics.

Some significance must also be given to the manner in which the "Ecsaine" or "Ultrasuede" is imported. It is described on the commercial invoices as a man-made plastic leather *cloth*. It is imported in 45-inch widths and is measured lengthwise in yards, both being measurements more commonly used in the fabric industry than in the leather industry.

## II.

■ Even if this court were to find that the merchandise is not a fabric for tariff schedule purposes, the presumptively correct classification by Customs should stand. The plaintiff is required to prove, in order to prevail, that the cost of the plastics exceeds that of any other component in the merchandise. The testimony of the witness, Mr. Ijiri, with respect to the costs of the various components was less than clear, even allowing for the difficulties of translating both questions and answers from the Japanese language. In one portion of his testimony (R. 26) he stated that the cost of the "Ecsaine" was _ _ _ yen [confidential data excluded from publication] per meter and that the cost of the polyester component is about _ _ _ yen [confidential data excluded from publication] per meter. This would make the polyester fiber the component material in chief value of the imported merchandise. He also stated that he was unfamiliar with or could not remember how the price of the fiber component of the "Ecsaine" was arrived at (R. 42–43).

In *Canadian Vinyl, supra,* this court, in determining how the cost of the various components is to be arrived at, stated (76 Cust.Ct. at 62, 408 F.Supp. 1377):

> Plaintiff disproved the correctness of the classification by showing that the importation was not wholly or in chief value of the nylon textile material which, under general headnote 9(f)(i), would be a necessary prelude to classifying this importation as "of" textile material. In fact, plaintiff proved that at the time the components of this material were ready to be joined together (*which is the appropriate time to determine their relative value*) the cost of the nylon portion was approximately 51 cents per yard and the cost of the polyurethane portion was approximately $1.13 per yard. [Footnote omitted; emphasis added.]

Accordingly, in determining the value of the fibers, as compared to the value of the polyurethane, we must determine the cost of preparing the fibers for the joinder. We find that the costs of all the steps up to the joinder of the polyurethane with the fiber sheet, exclusive of the cost of the polyurethane, are attributable to the fiber component, and that these costs exceed the cost of the polyurethane.[5] This is especially true since the cost breakdown provided by plaintiff for the polyurethane included the cost of chemicals and solvents, which were not identified in the testimony. We cannot accede to plaintiff's claim that the cost of the resin should be attributed to the plastics material since the resin was not identified by the witness, despite the fact that he was specifically asked what resin is used in the manufacture of the merchandise (R. 57). In view of these considerations and of the fact that the witness did not possess personal knowledge of the costs of some of the components as compared with others, plaintiff has not proved that the cost of the plastics material exceeds that of the fiber component, or for that matter, that of any of the chemicals or solvents that are used in the manufacturing process.

5. Based on the figures provided by plaintiff, we find the cost of the fiber component to be _ _ _ yen per meter and the cost of the polyurethane component to be approximately _ _ _ yen per meter [These figures are confidential data excluded from publication].

### III.

We consider next plaintiff's alternative claim that the involved merchandise, if not classifiable as articles of plastics, is properly classifiable under item 359.60 as a textile fabric, not specially provided for, inasmuch as the merchandise is of plastics, and there is no specific provision in schedule 3 for textile materials of plastics.

In pressing its alternative claim under item 359.60, plaintiff concedes that the merchandise is a textile fabric. If it is also a nonwoven fabric of man-made fibers, it must, a fortiori, be classified under item 355.25 by reason of General Interpretative Rule 10(c) since that item contains more difficult requirements to satisfy than item 359.60.

 In determining whether a textile fabric is of a particular type of fiber, or in chief value of a particular fiber, the coating or filling, or the nontextile laminating substances, are to be disregarded in the absence of context to the contrary, according to headnote 4(b) to schedule 3. Disregarding, therefore, the polyurethane and the resin with which the polyester fibers are coated or covered, the value of the polyester fibers exceeds the value of any other component in the merchandise, if indeed there is any (see plaintiff's exhibit No. 5), except for the dye, which is not in dispute.

The merchandise also falls within the definition of "nonwoven fabrics" contained in schedule 3, part 4, subpart C, headnote 2(b) which defines that term to include "fabrics made of matted textile fibers, which are not in the form of yarns, but includes needle-punched felts comprised of fibers punched through a base fabric * * *."

Additionally, the superior heading to item 355.25 renders the value of the plastics material irrelevant. The merchandise is concededly of man-made fibers, disregarding the polyurethane and other fillers, and was properly classified under item 355.25.

### CONCLUSION

This court concludes that the "Ecsaine" or "Ultrasuede" is a non-woven textile fab-

ric of man-made fibers for purposes of tariff classification and the presumptively correct classification under item 355.25 should be confirmed as correct. Plaintiff's claimed classification under item 774.60 dismissed, as is its alternative claim under item 359.60.

Let judgment be entered accordingly.